**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 23-cr-000359 (TSC)** |
| **v.** | |
| **CAHLYL ROLLINS,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**</u>

Mr. Bragg and his co-defendant Mr. Rollins engaged in a spree of bombings of commercial buildings in Maryland and D.C. They detonated explosives near populated areas with no concern for the damage they could cause and the harm they could do.   Mr. Rollins was the trigger man. At each of the four locations, it was Mr. Rollins who stepped out of the car carrying the explosive, lighting it, and then placing it. Why did Mr. Bragg and Mr. Rollins expose our community to this reckless of violence? Money. Mr. Bragg and Mr. Rollins were testing a method for robbing ATMs and other stores. Chillingly, they did not rob a single store during their early morning spree. They caused thousands of dollars in damage and threatened human life all as practice to commit future crimes. This is not Mr. Rollins' first offense. He has previously been convicted in relation to the possession of a firearm while fleeing law enforcement at high speeds. The Court should weigh the egregious nature of Mr. Rollins' conduct against his relatively youth when compared to his co-defendant. The Court should also consider the fact that Mr. Rollins was arrested without incident while Mr. Bragg evaded law enforcement for months and destroyed evidence.   Considering those factors, the Government requests that the Court sentence Mr. Rollins to eight years' incarceration followed by three years of supervised release.

## BACKGROUND

### *The Instant Offense*

On July 2, 2023, between 3:53 and 4:44 AM, Mr. Rollins and accomplices placed and detonated four explosive devices in Maryland and D.C. outside commercial buildings. Surveillance video, license-plate readers, and cell site location data reflect that Rollins traveled between those four locations in a metallic Acura model TL sedan with Maryland license plate 17971CK. At each location, Rollins stepped out of the vehicle, ignited and then placed or tossed a homemade explosive device, before driving to the next location and ultimately fleeing.

### *The 3:53 AM Bombing at 5430 Silver Hill Road, District Heights, Maryland*

At approximately 3:53 AM, Bragg and Rollins placed and detonated an explosive device outside of a Bank of America ATM at 5430 Silver Hill Road, District Heights Maryland, destroying the vestibule and structure surrounding the ATM.

*Figure 1*



The ATM was in a strip mall next to a beauty supply store, a grocery store, and a fast-food restaurant. Surveillance video reflects that Mr. Rollins—dressed in black Croc-style shoes, white

socks, black Nike sweatpants, a light or cream-colored hoodie, a black face mask and black gloves approached the ATM prior to the bombing.

*Figure 2*



Mr. Rollins' hood is cinched to obscure his face. In his hands, Mr. Rollins was carrying a red-and-white striped tube which appears to be a homemade explosive device.

*Figure 3*



Mr. Rollins placed the device, lit it, and walked away before it exploded.

3

***The 4:30 AM Bombing at Truist Bank, 2360 Washington Place NE, Washington, D.C.***

Thirty-seven minutes later, at approximately at approximately 4:30 AM, Mr. Rollins placed and detonated a second device outside of a Truist Bank at 2360 Washington Place NE, destroying the vestibule and structure surrounding multiple ATMs.[1]

*Figure 4*



This block, next to the Rhode Island Avenue Metro Station, includes both commercial businesses on the first floor, as well as multiple apartment buildings. Surveillance video reflects that Mr. Rollins—dressed exactly as he was when he placed the first bomb—stepped out of the passenger seat of the metallic sedan and approached the bank. He then placed a device consistent in appearance with the first bomb, lit it, and fled the area in the same sedan, which also contained

---

[1] This location is approximately nine miles from the first bombing and, during normal traffic conditions at legal speeds it would take a car approximately thirty-five minutes to drive that distance.

Mr. Bragg.

*Figures 5 and 6*





At the time of the bombing a woman was seated on the same block as the explosion. The vehicle

carrying Mr. Rollins, in which Mr. Bragg was either a passenger or driving, passed this woman before he placed the explosive device. She was fortunately not harmed.

### *The 4:36 AM Bombing at the Nike Store at 700 H Street NE, Washington, D.C.*

Six minutes later, at approximately 4:36 AM, a third device was placed and detonated outside of the Nike Store at 700 H Street NE, destroying the front vestibule.[2]

*Figure 7*



Surveillance video reflects that a metallic sedan approached the store, drove past it, made a U-turn, before stopping next to the store. Mr. Rollins then stepped out of the vehicle, rounded the corner, ducked into the entryway of the store, and then ran back to the vehicle.

---

[2] This location is approximately 2.5 miles from the first bombing and, during normal traffic conditions at legal speeds it would take a car approximately fifteen minutes to drive that distance. In the middle of the night with little traffic and at higher speeds it would take less time.

6

*Figures 8 and 9*



Shortly after, a device detonates, shattering windows in the store's vestibule. Mr. Rollins climbed

back into the car and the vehicle fled along with Mr. Bragg.

### *The 4:44 AM Bombing of the Safeway at 322 40th Street NW, Washington, D.C.*

Eight minutes later, at approximately 4:44 AM, a fourth device was placed and detonated

outside of a Safeway at 322 40th Street NE.[3]

*Figure 10*



---

[3] This location is approximately 2.5 miles from the first bombing and, during normal traffic
conditions at legal speeds it would take a car approximately ten minutes to drive that distance. In
the middle of the night with little traffic and at higher speeds it would take less time.

Surveillance video reflects that Mr. Rollins approached the front of the Safeway, lit a device consistent in appearance with the other three devices, and tossed it into the entryway.

*Figures 11 and 12*





The device exploded damaging the entryway doors and fixtures. Employees were present inside the store cleaning and preparing for the store to open. Indeed, one employee was standing just on the other side of the vestibule at the time of the explosion. Fortuitously, no one was harmed.

### ***The Bombing Vehicle***

The metallic Acura sedan used in the bombing bore Maryland license plate 17971CK. That license plate was provided by the state of Maryland to a private company that is authorized to sell titling papers and license plates but has never been registered to a vehicle. Despite concerted law

8

enforcement efforts to locate the vehicle, the vehicle has not been seen since the morning of July 2, 2023. Since the offense, this license plate has been placed on other vehicles, including a gray Dodge Durango that was used to rob an ATM from a 7-Eleven in Crofton, Maryland.[4]

### *The Explosive Devices*

*Figures 13 and 14*



ATF Certified Explosives Specialists identified and collected the remnants of the suspected explosive devices at each of the four bombing locations. Analysis of the remnants indicates that similar devices exploded at each scene. Based on their analysis of the remnants on scene, as well as reviewing the damage to each building and surveillance footage of the devices and their

---

[4] In that robbery, a crew that appeared to be trained or experienced used a mechanical tool to remove the money from the ATM before fleeing in the Durango. The same group then drove to a 7-Eleven in Hyattsville, Maryland and robbed an ATM there in a similar manner. A gray Dodge Durango with a different license plate was subsequently used in multiple similar robberies around the DMV area of ATMs. In each, a crew of apparently trained individuals used mechanical or hydraulic tools to force open ATMs before fleeing.

explosions, ATF specialists identified these devices as homemade carboard encased explosive devices. Devices such as these are generally created by filling a cardboard or other tubing with potassium chloride or potassium chloride and aluminum. These components are referred to colloquially as flash powder. Flash powder is an explosive regulated by the ATF. Devices like these are not commercially manufactured or otherwise available for the public to purchase. Such devices are often referred to as "quarter" or "half sticks," though they are not technically dynamite. In their smallest form these devices are often referred to as M80s. These devices, however, appear significantly larger. When ATF has recovered devices of similar size, they have contained approximately four pounds of flash powder. The legal limit for possessing flash powder is fifty milligrams.[5]

### *The Identification of Mr. Rollins as the Bomber*

Law enforcement obtained search warrants for the cellular towers associated with the four bombing locations on the date and approximate times of the bombings.   A device associated with Mr. Rollins was one of just four devices that were all in the vicinity of three of the four bombing locations.[6]

Specifically, one of the devices was registered to an Apple account in the name "Cahlyl Rollins" with email "rollinsc2010@yahoo.com." Law enforcement subsequently received records from Apple for this account.   The account contained numerous photographs, including

---

[5] 4 pounds of flash powder is equivalent to 1,814,368 milligrams. In other words, these devices were likely around 36,000 times the legal limit.

[6] The only bombing location at which this device did not appear was at the Nike Store bombing location.   It is possible that given the relatively short amount of time the suspects spent at the Nike Store and given the relatively short distance between the Truist Bank Bombing, the Nike Store, and the Safeway, the device simply did not ping on towers servicing the Nike Store.

many "selfie-style" photographs of an individual who appears to be Cahlyl Rollins, including of

Mr. Rollins carrying different firearms.

*Figures 15 and 16*



Additionally, the account included images of Mr. Rollin's driver's license and documents

bearing his name.

*Figures 17 and 18*

 

The Apple account also reflected messages between Mr. Rollins' phone number and one of the other devices that was present at three of the four bombing locations.    For example, on July 2, 2023, after the bombings, Mr. Rollins received a text from the user of that device asking him to provide tools to remove the rims of an Acura.    An account associated with that other device contained numerous photographs of the bombing vehicle with the unregistered Maryland license plate affixed.

### *The September 29, 2023 Search Warrant of Mr. Rollins' Residence and Storage Unit*

In the course of this investigation, law enforcement became aware of a storage unit that was potentially linked to this offense, located at the Self-Storage Plus at 1325 Kenilworth Avenue, NE.    While the unit was registered under a different name, records reflect multiple phone calls between Mr. Rollins and the listed owner's number.    Law enforcement obtained access records and surveillance video for the storage unit.

The records and video reflect that on July 1, 2023, several hours before the bombing at 6:30 PM, Mr. Rollins accessed the storage unit.

*Figures 19 and 20*



At the time he accessed the unit, Mr. Rollins is wearing the same pants, socks, and shoes as the individual who placed and ignited the explosive devices several hours later.

*Figures 20 and 21*



Surveillance video reflects that Mr. Rollins returned to the storage unit at approximately 9:00 AM on July 2, 2023, less than five hours after the last bomb was detonated.

Law enforcement conducted surveillance on locations associated with Mr. Rollins device. Law enforcement observed Mr. Rollins for multiple days accessing and remaining at a home at 1635 U Street Southeast.   Law enforcement also observed Mr. Rollins use a key to enter the residence.

On September 29, 2023, law enforcement executed a search warrant of that residence. Inside the home, law enforcement found Mr. Rollins who appeared to be staying in a living room of the residence.   Law enforcement found the device associated with Mr. Rollins as well as another device at three of the four bombing locations.   The second device had been smashed.

Additionally, law enforcement recovered a firearm on the porch, an extended magazine in the home, a bag of key fobs, a device that can be used for reprogramming key fobs to steal

vehicles, and a backpack of burglary tools including headlamps, handheld radios, and hand tools. A vehicle registered to Mr. Rollins was found outside. That vehicle was fitted with a device that could extend a cover over the license plate to obscure it with the touch of a button.[7] While Mr. Rollins waited outside during the search warrant, a law enforcement officer offered to provide him with shoes. Rollins indicated that he had a bunch of shoes in the living room. Among the shoes in the living room was a pair of black Crocs consistent with those used during the bombings.

Law enforcement also conducted a search of the storage unit which Mr. Rollins accessed before and after the bombings. Law enforcement recovered thirty-eight license plates, thousands of rounds of different ammunition (weighing more than two-hundred pounds), and additional burglary tools. Of the thirty-eight license plates, many were involved in other crimes in the area.

On October 12, 2023, Rollins was indicted on four separate counts for the Malicious Use of Explosive Materials in violation of 18 U.S.C. § 844(i). Rollins was arrested on October 30, 2023. On September 25, 2024, Mr. Rollins pled guilty to four counts of violating 18 U.S.C. 844(i) (Malicious Use of an Explosive Material).

### *The Pre-Sentence Report*

The Pre-Sentence Investigation Report (PSIR) summarizes Mr. Rollins' personal, educational, and criminal history. Mr. Rollins is twenty-four and was born and raised around the greater Washington, D.C. area. PSIR at *2, ¶ 80. Mr. Rollins reported a somewhat difficult childhood with a lack of basic necessities such as food, water, and electricity. PSIR at ¶¶ 83-84.

---

[7] Mr. Rollins was arrested when he came to pick up his vehicle after it was searched.

He has multiple siblings.   PSIR at ¶¶ 81-82.   Mr. Rollins suffers from asthma.   PSIR at ¶ 90.

He also reported that he suffers from AHD and has a history of drug and alcohol abuse.   PSIR at

¶¶ 93, 95.   Mr. Rollins graduated from high school in 2018 and while in jail has completed certain

courses.   PSIR at ¶¶ 98-99.   Mr. Rollins reported sporadic employment as an assistant manager,

service center manager, and other positions including at Honda, WaWa, and best Buy.   PSIR at

¶¶ 101-105.

The PSIR also reflects that Mr. Rollins was arrested on March 1, 2023 and charged with

Reckless Driving and Attempting to Elude a Police Stop.   PSIR at ¶ 70.   As reflected in the PSIR,

Mr. Rollins fled from a traffic stop at a high rate of speed through an apartment complex.   *Id.*

Rollins fled from the vehicle on foot and was found hiding nearby.   *Id.*   Also nearby was a

backpack containing a loaded privately manufactured handgun, also known as a ghost gun.

### *The Applicable Guidelines Range*

The PSIR estimates a total offense level of 25, a criminal history category I, and a resulting

applicable guidelines range of fifty-seven to seventy-one months, of which sixty months is

mandatory. PSIR at ¶ 113. The PSIR also reflects a guideline term of supervised release of one to

three years, and a fine of $20,000 to $200,000. PSIR at ¶¶ 118, 132. The Government agrees with

these calculations.

## ARGUMENT

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a

sentencing court "must consult those Guidelines and take them into account when sentencing."

543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The

Supreme Court has noted that while the Guidelines provide "the starting point and the initial

benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>>> (i) issued by the Sentencing Commission . . .; and
>>> (ii) that, . . . are in effect on the date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement –
>> (A) issued by the Sentencing Commission . . . and
>> (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

16

(7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions.").

And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

The Government recommends that the Court sentence Mr. Rollins to eight years of incarceration, followed by three years of supervised release. The Government also recommends that Mr. Rollins and his co-defendant Mr. Bragg be ordered to pay restitution in the amount of

17

$56,203.30. *See* PSIR at ¶ 29a. This sentence provides a significant penalty to Mr. Rollins, commiserate with the egregious nature of his violent offenses and the danger he poses to the community, as well as a significant deterrent to those who might imitate his crimes.   It also reflects his relative youth compared to Mr. Bragg, as well as the fact that unlike Mr. Bragg, he was arrested without issue and did not attempt to evade law enforcement.

I.      **The Nature and Circumstances of Mr. Rollins' Offenses.**

The crimes to which Mr. Rollins pled guilty are incredibly serious. Mr. Rollins and his conspirators set and detonated four explosive devices in Maryland and D.C. in a chilling and dangerous late-night escapade. They did so without concern for the damage it would do to those businesses or the extreme threat to human life each device posed.

While Mr. Bragg was the driver, Mr. Rollins planted and lit each bomb. After planting the first bomb, and witnessing its destructive power, Mr. Bragg drove Mr. Rollins to Truist bank. Bragg and Rollins drove past the bank and turned back around. As they did, they drove past a woman sitting on the sidewalk, their headlights illuminating her from just a car-length away. Despite this, Mr. Rollins planted a bomb just down the block from this woman. He did so notwithstanding the many businesses in the area which could have employees reporting to open for the day. He did so despite the many residential apartments surrounding this bank. He planted and lit this bomb without hesitation for the property and lives he might destroy.

After detonating this second device and causing significant damage, Mr. Bragg and Mr. Rollins drove to the Nike Store on H Street NE. The H Street corridor is a heavily trafficked stretch of bars and restaurants. At that time, even at that hour, they passed multiple cars and people on the sidewalk. Undeterred by the possibility of the loss of human life, Mr. Rollins planted and ignited

a third device.

Their rampage only continued.   Bragg and Rollins drove to a Safeway. The lights in that Safeway were illuminated because its employees were already at work inside the store preparing it for customers. At this final location, Mr. Rollins (apparently aware that there were people inside) did not carefully place the device in front of the store. Instead, Mr. Rollins callously tossed it at the front vestibule after igniting it. An employee was just inside the store past the vestibule when the device exploded. It is fortuitous that neither he nor any of the other employees were injured.

It is difficult to imagine more reckless, callous, or dangerous conduct than what Mr. Rollins and his conspirators engaged in on July 2, 2023. But their motive in doing so is particularly chilling. As noted above, Mr. Bragg and Mr. Rollins are tied to a series of ATM robberies involving, among other things, "Jaws of Life."   Devices associated with an unindicted co-conspirator were also present at the robbery locations. That unindicted co-conspirator is currently facing charges for a similar ATM robbery. And Mr. Bragg and Mr. Rollins exchanged messages discussing the robbery of at least one ATM, as well as obtaining hydraulic tools. Notably, Mr. Bragg and Mr. Rollins did not actually steal a single thing during these offenses. Instead, they appeared to be beta-testing a new robbery method on a variety of different targets. Mr. Bragg and Mr. Rollins caused thousands of dollars and damage and threatened human life as mere practice for future crimes. This behavior demands a significant term of incarceration.

## II.    Mr. Rollins' History and Characteristics.

Mr. Rollins only has one criminal conviction.   But that conviction is for a dangerous offense.   Mr. Rollins fled police in a vehicle at high speeds while apparently in possession of a loaded firearm.   It appears that Mr. Rollins was permitted to plead guilty to a less serious offense.

In other words, he received a second chance. Mr. Rollins could have used that chance to seek meaningful employment and avoid further criminal offenses. But he did not. Instead, while on supervision for that case, Mr. Rollins engaged in these offenses, and, based on the evidence recovered at the time of his arrest, was engaged in an enterprise of other offenses.

Mr. Rollins was found in a home containing a device that can be used to acquire the RFID code for car key fobs and reprogram other fobs with that code. In other words, he was found with a device that is used to steal cars. In the same home was a bag of key fobs, indicating that stealing vehicles is exactly the purpose of this device. A gun was found on the porch, a magazine was found in the house, and a backpack of burglary tools was found in the living room where Rollins had been staying. Found in Rollins' storage unit were thousands of rounds of ammunitions and thirty-eight license plates, many of which are associated with other criminal activity. And Mr. Rollins' own vehicle was fitted with a device specifically designed to evade law enforcement by obscuring the car's license plate number.

These are not the types of items associated with a law-abiding citizen who made a single bad decision on a single night. Mr. Rollins was engaged in the charged offense while pending trial in his Reckless Driving Case, and in possession of these many items while on supervision. The Court should be gravely concerned as to the uses Mr. Rollins made of these many implements of crime, including thousands of rounds of ammunition.

A short period of incarceration followed by supervision has not deterred Mr. Rollins. A significant period of incarceration is required to prevent him from committing future crimes.

### III.    __The Need for the Sentence Imposed.__

Mr. Rollins has access to sophisticated devices used to steal cars, tools used to obscure his

identity, and explosive devices. He has no compulsion about using them. Indeed, he used multiple of these explosive devices to damage commercial buildings without regard to the damage or potential threat to human life. A term of incarceration within the Guidelines does not account for the egregious nature and circumstances of Mr. Rollins' offenses, particularly in light of the egregious nature of these offenses.

*First*, the Guidelines range here does not fully account for the four separate bombings in which Mr. Rollins participated. The Guidelines range is effectively sixty to 71 months' incarceration. But if Mr. Rollins had committed just one bombing, his Guideline range would be sixty months' incarceration. Eleven additional months simply does not account for an additional bombing, let alone three additional bombings. The bombings did not grow less dangerous as they were committed, they grew more dangerous. While the first bombing appears to have been in a deserted shopping area, the second bombing was in a residential area. Indeed, Bragg and Rollins drove past a woman sitting nearby before Rollins planted a bomb. The third bombing was on the heavily trafficked H Street NE corridor, a strip where members of our community are present even in the middle of the night. And the fourth bombing was of a grocery store with employees inside and near the alcove which Mr. Bragg and Mr. Rollins exploded. A sentence even at the top of the Guidelines fails to account for the incredibly and increasingly dangerous and public nature of each additional bombing.

*Second*, the Guideline range does not account for the chilling nature of Mr. Bragg's and Rollins' exploits. They would be facing a guideline range of approximately sixty months' incarceration if they had simply blown up an ATM for no reason at all. But Mr. Bragg and Mr. Rollins had a reason. Their exploits that evening were part of a broader criminal enterprise to steal

from others to enrich themselves. That motive—which is not an enhancement under the Guidelines—must be accounted for in sentencing. Specifically, it is that motive, and the efforts of men like Mr. Bragg and Mr. Rollins to cause terror for financial gain that must be deterred. A Guidelines sentence does not sufficiently deter their purposeful conduct.

*Finally*, as reflected above, Mr. Rollins' criminal history category understates his conduct and the danger he presents to our community. Mr. Rollins had access to dozens of license plates, many used in other crimes, a device for reprogramming key fobs to steal vehicles along with key fobs, and a backpack of burglary tools including headlamps, handheld radios, and hand tools. Given his history, the offense conduct, and Mr. Rollins' spotty employment history, it is evident the use to which Mr. Rollins was putting these tools.

At the same time, the Court should sentence Mr. Rollins comparatively, consistent with any discrepancies between Mr. Rollins and Mr. Bragg.  Mr. Rollins is significant younger than Mr. Bragg.  While the difference in age does not suggest that Mr. Rollins was in any way misled or coerced into engaging in these offenses, Mr. Rollins' relatively younger age is a mitigating factor. Further, Mr. Rollins, unlike Mr. Bragg, did not attempt to flee law enforcement by jumping from a roof and then successfully evade law enforcement for two months.  Nor did Mr. Rollins destroy any evidence like Mr. Bragg.  Therefore, Mr. Rollins should not be punished as severely as Mr. Bragg.

The requested sentence of eight years' incarceration will further the goals of sentencing. It will specifically deter Mr. Rollins from committing crimes for a significant period of time, protecting our community from a proven danger. It will provide general deterrence, signaling to others that reckless violence undertaken for financial gains does not pay and will be taken

seriously. Finally, it will provide a structured environment for Mr. Rollins to reflect on his offenses, continue his education as he has been, enroll in needed vocational training, and return to society.

## CONCLUSION

For all the foregoing reasons, the Government requests that the Court sentence Mr. Rollins to eight years' imprisonment, followed by three years of supervised release, and restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:        */s/ Cameron A. Tepfer*
Cameron A. Tepfer
D.C. Bar No. 1660476
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
202-258-3515
Cameron.Tepfer@usdoj.gov